STEVEN G. KALAR
Federal Public Defender
CARMEN A. SMARANDOIU
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    415.436.7700
Facsimile:     415.436.7706
Carmen_Smarandoiu@fd.org

Counsel for Defendant REUBEN PRECIADO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>REUBEN PRECIADO,<br><br>Defendant. | Case No. CR 16-00010 CRB<br><br>DEFENDANT REUBEN PRECIADO'S SENTENCING MEMORANDUM<br><br>Date:   May 11, 2016<br>Time:   10:00 a.m.<br>Court:  Hon. Charles R. Breyer |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**INTRODUCTION**................................................................................................................ 1

**CASE BACKGROUND**........................................................................................................ 1

**OBJECTIONS TO THE PRESENTENCE REPORT** ..................................................... 3

**A CUSTODIAL SENTENCE OF 72 MONTHS WOULD BEST**
**SATISFY THE GOALS ARTICULATED IN SECTION 3553** .......................................... 6

   **I.**    **Sentencing Framework**.......................................................................................... 6

   **II.**   **Mr. Preciado's Life** ................................................................................................. 6

   **III.**  **Mr. Preciado's Offense** ......................................................................................... 11

   **IV.**  **A Just Sentence That Affords Adequate Deterrence and Protects the Public** .......... 11

**CONCLUSION** ...................................................................................................................... 14

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Descamps v. United States*,
   133 S. Ct. 2276 (2013) ........................................................................ 3

*Medina-Lara v. Holder*,
   771 F.3d 1106 (9th Cir. 2014) ...................................................... 3, 4, 5

*Padilla-Martinez v. Holder*,
   770 F.3d 825 (9th Cir. 2014) ............................................................... 3

*Rita v. United States*,
   551 U.S. 338 (2007) ......................................................................... 12

*Shepard v. United States*,
   544 U.S. 13 (2005) ............................................................................. 3

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) (en banc) .............................................. 6

*United States v. Vidal*,
   504 F.3d 1072 (9th Cir. 2007) (en banc) ......................................... 3-4

**Federal Statutes**

18 U.S.C. § 922(g)(1) ............................................................................ 1, 2

18 U.S.C. § 924(c)(1) ............................................................................ 1, 2

18 U.S.C. § 3553(a) ................................................................................... 6

21 U.S.C. § 841(a)(1), (b)(1)(C) ............................................................ 1, 2

**Sentencing Guidelines**

USSG § 2K2.1 ........................................................................................ 2, 3

**State Statutes**

Cal. Health & Safety Code § 11055(d)(1), (2)............................................ 4

Cal. Health & Safety Code § 11378.................................................... 3, 5

Cal. Penal Code § 12021(a)(1) .................................................................. 4

Cal. Penal Code § 12022(c) .................................................................. 4, 5

**Other**

28 C.J.S. *Drugs and Narcotics*
   § 12 (2016) ......................................................................................... 4

ii

*US v. Preciado*, No. CR 16-00010 CRB;
Def.'s Sent. Mem.

1

2

Mark W. Lipsey & Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews*,
    3 Ann. Rev. L. & Soc. Sci. 297, 302 (2007) ............................................................. 13

Michael Tonry, *Purposes and Functions of Sentencing*,
    34 Crime & Just. 1, 28 (2006) ................................................................................... 13

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

**INTRODUCTION**

Mr. Reuben Preciado, through counsel Carmen A. Smarandoiu, hereby submits the following sentencing memorandum in support of his request for imposition of a combined sentence of 72 months of custody and 72 months of supervised release.  Specifically, he respectfully requests that the Court impose the following sentences:

• A sentence of 12 months imprisonment and 72 months of supervised release for his offense of possession with intent to distribute a controlled substance near a school in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 860(a);

• A sentence of 12 months imprisonment and 36 months of supervised release for his offense of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), to be served concurrently with the sentence for his drug offense;

•  A sentence of 60 months imprisonment, to be served consecutively to the other terms of imprisonment, and 60 months of supervised release, to be served concurrently with the other terms of supervised release, for his offense of using, carry, or possessing a firearm in connection with a drug trafficking crime in in violation of 18 U.S.C. § 924(c)(1).

**CASE BACKGROUND**

On November 19, 2015, San Francisco Police received a tip that Mr. Preciado had drugs and a gun in his car.  *See* Presentence Investigation Report (hereinafter, "PSR") ¶ 6.  Using the information provided by the tipster, an undercover San Francisco police officer texted Mr. Preciado on his cell phone.  PSR ¶ 7.  Mr. Preciado agreed to meet the undercover officer and sell him crystal methamphetamine for $200.  PSR ¶ 8.

Mr. Preciado met with two undercover officers at the intersection between the 16th and Capp Streets in San Francisco.  *Id.*  At the time of the transaction, he was sitting inside his car and had a large dark jacket across his waist with both hands underneath the jacket.  *Id.*  After a brief conversation, the undercover officers gave Mr. Preciado two $100 bills (Marked City Funds) in exchange for a baggie of methamphetamine mixture, which he removed from under the jacket.  *Id.*

1

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

Mr. Preciado then drove away.  *Id.*  He was stopped and arrested a short while later.  PSR ¶ 9.  A search of his person and car revealed a loaded Jimenez Arms 380 handgun that had been reported stolen inside the inner breast pocket of a jacket located on the passenger seat, six DRT-brand .380 caliber ammunition rounds, and three plastic baggies containing a total of 25 grams of a methamphetamine mixture. PSR ¶¶ 8, 9.

On January 7, 2016, the government filed a three-count indictment charging Mr. Preciado with one count of possession with intent to distribute a controlled substance near a school in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 860(a); one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1); and count of using, carry, or possessing a firearm in connection with a drug trafficking crime in in violation of 18 U.S.C. § 924(c)(1).  On February 24, 2016, he pleaded guilty to all three counts pursuant to a plea agreement made under Fed. R. Crim. Proc. 11(c)(1)(A) and 11(c)(1)(B).  *See* Docket No. 12 (hereinafter, "Plea Agreement").

Under the terms of the plea agreement, Mr. Preciado and the government agreed that, "when imposing the sentence, the Court should use the Guideline calculation for Count Two: a violation of 18 U.S.C. § 922(g)(1)." *Id.* ¶ 7.  Specifically, the parties agreed to the following offense level calculation: a base offense level of 22 under USSG § 2K2.1(a)(3)("semiautomatic firearm; one prior drug trafficking offense"); a two-level enhancement under USSG § 2K2.1(a)(3)("stolen firearm"), and a three-level deduction for acceptance of responsibility, resulting in an adjusted offense level of 21.  *Id.*  The parties did not reach an agreement regarding Mr. Preciado's criminal history category.  *Id.*

The government agreed to recommend "a sentence within the Guidelines range for the adjusted offense level calculated pursuant to paragraph 7 and the defendant's Criminal Hisotrt Category as determined by the Court," but no lower than 72 months, the combined mandatory minimum in the case.  *Id.* ¶ 17.

2

**OBJECTIONS TO THE PRESENTENCE REPORT**

The PSR disagrees with the parties' guideline calculation. Rather, relying on Mr. Preciado's convictions in Alameda County Superior Court Docket Nos. H32724 and H35583, it concludes that he has two prior convictions for a "controlled substance offense" and, therefore, his base offense level is 24 under USSG § 2K1.1(a)(2) and he is also a career offender. *See* PSR ¶¶ 18, 24; *id*. Addendum ¶¶ 9, 10.

The PSR notes that, "[a]ccording to Alameda County Superior Court Clerks Docket and Minutes," Mr. Preciado was convicted of violating "California Health & Safety Code 11378 – Possess Controlled Substance for Sale" in Docket Nos. H32724 and H35583. *Id*. Addendum ¶ 10. I notes that "[i]n both cases, the controlled substance was methamphetamine." *Id*. It concludes that, "[b]ecause court documents unequivocally support that the controlled substance involved in [either] state case is a substance listed in the federal statute, [either] conviction qualifies as a controlled substance offense." *Id*. The PSR is incorrect.[1]

California Health & Safety Code §11378 is *not* categorically a controlled substance offense. *See Padilla-Martinez v. Holder*, 770 F.3d 825, 832 n.3 (9th Cir. 2014). It is, however, divisible and subject to the modified categorical approach. *Id*. (citing *Descamps v. United States*, – U.S. –, 133 S. Ct. 2276, 2293 (2013)). Under this approach, "it 'makes no difference' if [Mr. Preciado] actually possessed or purchased, for sale, [methamphetamine]. Rather, what matters is whether [he] was convicted of possessing or purchasing, for sale, [methamphetamine], where [methamphetamine] is an element of the crime." *Medina-Lara v. Holder*, 771 F.3d 1106, 1113 (9th Cir. 2014). To make this determination, the Court may look only to certain judicially noticeable documents. *See Shepard v. United States*, 544 U.S. 13, 26 (2005).

The Ninth Circuit permits "reliance on an abstract of judgment in combination with a charging document to establish that the defendant pled guilty to a generic crime under the modified categorical approach." *Medina-Lara*, 771 F.3d at 1113 (internal quotation omitted). In that case, "the judgment must contain the critical phrase '*as charged in the Information*.'" *Id*. (quoting

---

[1]  Mr. Preciado does not challenge that his Criminal History Category is VI even without the career offender designation.

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

*United States v. Vidal*, 504 F.3d 1072, 1087 (9th Cir.2007) (en banc)).  Although the Ninth Circuit

has subsequently "not been so exacting as to require that the phrase 'as charged in the Information'

appear on the abstract of judgment," it has "never retreated from *Vidal*'s core requirement: When a

court using the modified categorical approach to determine whether an underlying conviction is a

predicate offense relies solely on the link between the charging papers and the abstract of

judgment, that link must be clear and convincing."  *Id*.  Put another way, the PSR "must

demonstrate that the abstract clearly and convincingly shows that [Mr. Preciado] pleaded guilty to

the element *as alleged in the complaint*."  *Id*. (emphasis added).

        In Docket No. H32724, the complaint itself fails to clearly identify the substance Mr.

Preciado was charged with possessing for sale.  The complaint includes two counts.  *See*

Declaration of Carmen A. Smarandoiu (hereinafter, "Smarandoiu Decl."), Ex. G (hereinafter,

"State Records") at 6—7.  Count one charged him with "POSSESSION FOR SALE OF A

CONTROLLED SUBSTANCE, a violation of section 11378 of the HEALTH & SAFERTY

CODE of California, in that said defendant(s) did unlawfully possess for purpose of sale a

controlled substance, to with: *amphetamines*."  *Id*. at 6 (emphasis added).  It further alleged "as to

count one, that in the commission and attempted commission of the above offense the defendant

Ruben Preciado was/were personally armed with a firearm within the meaning of Penal Code

section 12022(c)."  *Id*.[2]

        The complaint's use of the term "amphetamines" makes it unclear whether count one

charged Mr. Preciado with possessing for sale a specific substance (amphetamine) or *a group or

class* of substances (amphetamines, to which methamphetamine belongs).  *See* Cal. Health &

Safety Code § 11055(d)(1), (2) (schedule II drugs under California law include the stimulants

amphetamine and methamphetamine); 28 C.J.S. Drugs and Narcotics § 12 (2016) ("Amphetamine

and methamphetamine are considered two different substances.  An 'amphetamine' is a substance

which stimulates the central nervous system, while methamphetamine belongs to the amphetamine

drug group and by definition, it is a central nervous system stimulant.").  If anything, the arrest

[2] Count two charged him with possession of a firearm by a felon in violation of California Penal Code section 12021(a)(1).  *Id*.

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

report's reference to methamphetamine and "crystal," PSR ¶ 39, suggests that the complaint referred to the amphetamines class, and not to amphetamine, the specific substance.

Furthermore, it is unclear which substance or substances did Mr. Preciado plead guilty to. The only document pertaining to his change of plea is the Waiver on Plea of Guilty/No Contest (Felony). State Records at 4—5. It states that "I am charged with: 11378 H+S w/ 12022(c) clause; 12021(a)(1)," and that "I am pleading guilty/no contest to: 11378 H+S, 12021(a)(1)." *Id.* Although this document fails to identify the substance or substances to which Mr. Preciado pleaded guilty to possessing for sale, it makes clear that he did *not* plead guilty to count one "as alleged in the complaint" because count one, as alleged, included an enhancement under Cal. Penal Code § 12022(c) to which he did not plead guilty to. *Medina-Lara*, 771 F.3d at 1113.[3]

Nor do the clerk's docket and minutes identify the substance or substances involved in his section 11378 count. In fact, they add to the confusion by noting that Mr. Preciado was convicted by a "Plea of No Contest" of count "1," Code "PC," Section "F12021(a)(1)" and count "2," Code "HS," Section "F11378." State Records at 2. Of course, section 11378 was count one (not two) of the complaint. Thus, the clerk's docket and minutes underscore that Mr. Preciado did not plead guilty to count one "as alleged in the complaint." *Medina-Lara*, 771 F.3d at 1113.[4]

In conclusion, the documents relied on by the PSR make clear one thing only: that in Docket No. H32724, Mr. Preciado was convicted of violating Cal. Health & Safety Code § 11378. They, however, fail to clearly and convincingly establish that he was convicted of possessing for sale methamphetamine, as the PSR states. *See id.* For these reasons, the PSR's conclusion that this conviction qualifies as a "controlled substance offense" is incorrect. The Court should therefore reject the PSR's base offense level calculation and its career offender determination and adopt the parties' adjusted offense level calculation as set forth in the plea agreement.

---

[3]  For this reason, even if the complaint is read to charge Mr. Preciado with possession for sale of amphetamine (rather than amphetamines), the records relied on by the PSR are insufficient to clearly and convincingly show that he actually pleaded guilty to that charge "as alleged in the complaint." *Medina-Lara*, 771 F.3d at 1113.

[4]  The documents pertaining to the revocation of felony probation also fail to identify the substance or substances involved in Mr. Preciado section 11378 conviction. *See* State Records at 8—15.

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

## A CUSTODIAL SENTENCE OF 72 MONTHS WOULD BEST
## SATISFY THE GOALS ARTICULATED IN SECTION 3553

Mr. Preciado and the government agree that a combined sentence between 72 months (his combined mandatory minimum) and 96 months (the high-end of the guidelines range for offense level 21 and criminal history category VI) is reasonable in his case. *See* Plea Agreement ¶¶ 7, 17. For the reasons explained below, he respectfully requests a sentence of 72 months.

### I.      Sentencing Framework

In sentencing Mr. Preciado, the Court's overarching duty is to "impose a sentence sufficient, but not greater than necessary," to comply with the retributive, deterrent, and rehabilitative goals of sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).  Those goals include the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

Sentencing hearings must begin with a correct calculation of the applicable guideline range. *Id*.  The sentencing guidelines, however, are only one factor among many to be considered. *Carty*, 520 F.3d at 991.  Thus, the district court is required to consider several additional factors, including the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

### II.     Mr. Preciado's Life

Mr. Preciado's life so far has been defined by several important struggles: the struggle to earn his mother's love; the struggle to overcome his methamphetamine addiction; and the struggle to overcome his criminal history and maintain lawful employment.  Although he has given all hope of being loved by his mother, in the last several years, he appeared to prevail in his other struggles. Unfortunately, after losing his job in 2013 and being unable to secure new employment due to

6

*US v. Preciado*, No. CR 16-00010 CRB;
Def.'s Sent. Mem.

background checks, he became desperate, relapsed, and resorted to selling drugs to support his family.

Mr. Preciado was his mother's first son.  PSR ¶ 54.  Just weeks after his birth, the father abandoned the family and Mr. Preciado has never had a relationship with him.  *Id*.

Mr. Preciado's mother had him when she was very young, barely eighteen.  *See* PSR ¶¶ 54, 55.  Possibly due to her relative lack of maturity and unpreparedness for the responsibilities of motherhood, she always treated her firstborn, in the words of her own mother, "as an impediment to her happiness."  Smarandoiu Decl., Ex. B (hereinafter, "Owen Letter").  To her credit, she always provided materially for him and instilled in him a love of books and learning.  *Id*.  Nonetheless, she "didn't nurture him in the sense of providing a mother's love and closeness" and there were times when she treated him as a "throw away."  *Id*.

Not only did Mr. Preciado's mother withhold her love, but made sure that her son knew that he was unwanted and unloved.  Thus, it was not unusual for her to tell Mr. Preciado that she did not like him and that she wished he were never born.  PSR ¶ 54.  She was frequently emotionally abusive toward him and threw things at him.  *Id*.

Mr. Preciado's mother eventually remarried and has another son, Gabriel.  PSR ¶ 55.  Mr. Preciado had a decent relationship with his stepfather; however, he was also emotionally and, occasionally, physically abusive toward him.  *Id*.  He also sided with Mr. Preciado's mother whenever she was mad at him.  *Id*.

As a child, Mr. Preciado was frequently left home by himself.  *Id*.  The rules for such occasions were strict: the television and other electronics were unplugged and Mr. Preciado was not allowed to use the phone.  *Id*.  Apparently not trusting him to follow the rules, his parents would call repeatedly the home phone number while they were away.  *Id*.  When Mr. Preciado was unwise enough to answer the phone, he was punished, sometimes physically, for breaking the rules.  *Id*.  Mr. Preciado did not spend much time with his parents even when they were at home.  He was frequently sent to his room and occupied his time with books.  *Id*.

*US v. Preciado*, No. CR 16-00010 CRB;
Def.'s Sent. Mem.

Mr. Preciado's parents's treatment of him stands in stark contrast with their treatment of his brother, Gabriel, with whom they had a loving, supportive relationship.  *Id.*  Although the two brothers had a close relationship while growing up, their mother's animosity toward Mr. Preciado strained their relationship.  *Id.*  In fact, it appears that her animosity toward his son was so severe that she preferred to isolate herself from those friends and family members who attempted to help or defend him.  *Id.*  Tellingly, she is still estranged from her own parents because they maintained a relationship with Mr. Preciado and helped him against her wishes.  *Id.*

Despite the poor treatment Mr. Preciado received at home, he managed to do well in school and obtained a certificate in blueprint drafting through a high school program and received his high school diploma.  PSR ¶ 76.  Unfortunately, his promising life was derailed by drug use.

When Mr. Preciado was 12, he began using marijuana.  PSR ¶ 70.  At age 15, he tried methamphetamine for the first time.  PSR ¶ 71.  By his early twenties, his methamphetamine use matured into a severe methamphetamine addiction that gripped him until he was 27.  *Id.* Predictably, his drug use brought him in close contact with the world of drug dealing, which became his way of sustaining his habit.  Between 2002 and 2006, Mr. Preciado had been convicted three times of possession of a controlled substance for sale and one time of possession of a controlled substance.  PSR ¶¶ 38—41.  In 2006, at the age of 27, he was sentenced to five years imprisonment (of which he served 50 percent) after being found in a Motel 6 room with a syringe, a methamphetamine pipe, and 17.3 grams of marijuana.  PSR ¶ 41.[5]

While incarcerated, Mr. Preciado was found to suffer of several mental health conditions in addition to his methamphetamine dependency.  PSR ¶ 66.  These conditions were diagnosed at various times as social anxiety disorder, psychotic disorder not otherwise specified, bipolar disorder, and mood disorder.  *Id.*  Medication prescribed included Seroquel, Lithium, Abilify, and Zyprexa.  *Id.*  Upon his discharge from parole in 2012, he discontinued his medication due to lack of medical insurance.  PSR ¶ 68.  He is currently taking Buspar and Ablify for bipolar and anxiety disorder.  *Id.*

---

[5]  Although that conviction was initially a felony, it was recently reduced to a misdemeanor pursuant to Proposition 47.  PSR ¶ 41.

8

After his last conviction, at age 27, Mr. Preciado was determined to defeat his addiction and turn his life around. He had three great reasons to do so: his partner, Ms. Rickie Costa, and their two young sons, Rickey (now 11) and Ruben (now 10). *See* PSR ¶ 57; Smarandoiu Decl., Ex. D (family photographs).

Mr. Preciado is an involved father and has a strong and loving relationship with his sons. *Id*.; Owen Letter; Smarandoiu Decl., Ex. C (hereinafter, "Costa Letter"). He believes that extra-curricular activities keep children focused and help with academic performance, so, at his insistence, the boys started playing ice hockey when they were 5 and 4, respectively. *Id*. He and Ms. Costa also enrolled their sons in an Aspire school, which requests that the students maintain their grades at a certain level. *Id*. Due to Mr. Preciado's extra work with his sons at home, they have always been at the top of their classes in mathematics. *Id*.

After his release from prison in December 2008, Mr. Preciado stayed in full compliance with the conditions of his parole and was discharged at the end of 2011. PSR ¶ 42; Smarandoiu Decl., Ex. A (hereinafter, "Preciado Letter") at 1. In 2009, he enrolled in the Peralta Community College, working toward his dream of earning enough credits to transfer to University of California at Berkley and major in Engineering. Preciado Letter at 4; Owen Letter. At Peralta Community College, he took a variety of high-level math and science classes, including intermediate and linear algebra; organic chemistry; and advanced calculus. Smarandoiu Decl., Ex. E. He completed 59 units and his cumulative GPA was 3.613. *Id*.; PSR ¶ 77.

In addition to attending school, Mr. Preciado worked full time. In 2010, he was hired by Advanced Home Energy, a company that contracted with PG&E and for which he initially conducted home assessments and equipment installation, and eventually became a warehouse manager. PSR ¶ 81. During his employment, he was "punctual, responsible, and reliable and he is eligible for rehire." *Id*. The company, however, had to let him go after PG&E decided to conduct criminal background checks and eliminated his position. *Id*.; Preciado Letter at 1. He then found employment with Bayshore Supply Company as a warehouse manager. PSR ¶ 80. After he was

9

*US v. Preciado*, No. CR 16-00010 CRB;
Def.'s Sent. Mem.

let go at the beginning of 2013, he was twice hired, by Kohl's and the Oakland Parks and Recreation Department, and each time let go after background checks.  Preciado Letter at 3.

Mr. Preciado tried to support himself as a painter, but work was "here and there and not enough to live." *Id*. at 1.  Soon "[b]ills piled up, I became 11,000 in debt on credit card, Alameda County wanted 8,000 for a botched surgery, I lost my car so had to rent cars to get around, I was overwhelmed and desperate." *Id*. at 2.  He felt immense pressure to keep his family off the streets and that "a father should and must do what he has to, to provide for my family." *Id*.  In 2015, under that pressure, he started using methamphetamine again after being clean for nine years.  *Id*. at 3.  At that point, "my fate was sealed." *Id*.  "I made a poor decision to try to temporarily relieve some financial pressures so I would not lose everything I worked so hard to attain." *Id*. at 2.

Looking back at the year 2015, Mr. Preciado is "sickened" at the turn that his life took then:

> I'm bitter at 2015 it seemed like everything went wrong.  I had done what I was supposed to up to then, working, going to school to be an engineer.  I hoped the next job was around the corner but no one ever called me back.  Since I was off parole my employment help expired but my history never will. . . . It was so frustrating and demoralizing and scary . . . .

*Id*. at 3.

Despite these recent setbacks, Mr. Preciado is determined to not allow his past to determine his future.  While in custody, he has remained involved in his sons' education by sending them math problems and reviewing their work when they return them to him.  PSR ¶ 57.  He intends to finish his degree, hopefully in mathematics.  *Id*. at 4; PSR ¶ 61.  For that purpose, he respectfully requests that the Court recommend that he be placed at FCI Florence in Colorado, USP Coleman in Florida, or FCI El Reno in Oklahoma, all of which offer degrees in mathematics or mathematics-related fields and the Residential Drug Treatment Program ("RDAP").

Mr. Preciado has also started writing children's books, which his grandmother will transcribe and submit to publishers.  *Id*. at 4; PSR ¶ 61; Smarandoiu Decl., Ex. F.  He is hoping that he will thus be able to support his family while incarcerated and afterwards.  Preciado Letter at 4.  In addition, he has been exploring several patent ideas and a food business.  *Id*.  He is hoping that, in so doing, he will still be able to be a good role model for his two sons.  *Id*.

10

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

### III.    Mr. Preciado's Offense

Mr. Preciado was a street-level drug dealer who sold two undercover police officers 15.2 grams of a methamphetamine mixture out of his car.  PSR ¶¶ 6—9.  At that time, he had a loaded semiautomatic pistol in his car.  *Id.*  Although Mr. Preciado claimed during his text message exchange with an undercover police officer that he "got as much [crystal] as [the buyer] want[ed]," PSR ¶ 7, the search of his car and person shortly thereafter revealed that this was a boastful remark.  In fact, he only had a total of approximately 25 grams of a methamphetamine mixture total.  PSR ¶¶ 8—9.

It also bears emphasizing that Mr. Preciado did not use the firearm or any type of violence in the offense.  Instead, he possessed it "for protection in the course of [his] possession with intent to distribute the mixture and substance containing methamphetamine."  Plea Agreement ¶ 2.  He bought it after two men robbed him in 2015.  Preciado Letter at 3.  They shot him "point blank in the head 3 times," beat him "bloody," and "left [him] to limp home."  *Id.*  As he explains, "I was lucky the gun turned out to be fake, a bb gun but I still have 2 bbs lodged in my skull. . . .  I am lucky to be here and that was traumatic for me, I live in the area of Oakland with highest robbery rate so I purchased a gun."  *Id.*  He still has the BB steel balls lodged in his forehead.  PSR ¶ 64.

### IV.    A Just Sentence That Affords Adequate Deterrence and Protects the Public

Mr. Preciado respectfully submits that a combined sentence of 72 months imprisonment, to be followed by 72 months of supervised release, is a just punishment that also affords adequate specific and general deterrence and protection to the public.

The requested sentence is appropriate in light of Mr. Preciado's offense, which involved a small quantity of drugs and did not involve violence.  It is also appropriate in light of his personal circumstances, especially the fact that he was raised in a home absent of emotional nurturing and which included repeated emotional, and sometimes physical, abuse at the hands of his mother and step-father; his serious mental health problems, which were not diagnosed and treated until he was incarcerated for his drug-related offenses in his mid-twenties; his methamphetamine addiction, which at its worst led him to incur four drug-related convictions in four years in his mid-twenties;

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

and the fact that, despite his obvious need and desire for drug treatment, he will not be able to benefit from the credit for the successful completion of RDAP due to the nature of his instant convictions.  *See Rita v. United States*, 551 U.S. 338, 364—65 (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines.  These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.").

The requested sentence is also appropriate because it is Mr. Preciado's first term of incarceration since he was released from prison in 2008, eight years ago.  During that time, he matured immensely, turned his life around, and proved without doubt that he could be a productive, law-abiding member of the community.  He managed to beat his methamphetamine addiction.  He enrolled in community college working towards a degree in Engineering and maintained a high GPA of 3.613 while taking many challenging classes and also working full-time.  He was appreciated at his job.  He successfully completed parole at the end of 2011.  He was a responsible, loving father and partner who provided for his family by his hard work and dreamed of transferring to Berkley to complete his degree in Engineering.

Unfortunately, Mr. Preciado's dream and the life he had worked so hard to build came crashing down under the weight of his moral and financial responsibilities as debts mounted after losing his last position and finding himself unable to secure a new one due to background checks.  His desperation led to his relapse and his relapse to this offense.  While this is not an excuse, it does show that Mr. Preciado only returned to crime to provide for his family and only after insistent efforts to do so by lawful means.

Notably, a combined sentence of 72 months would represent the longest sentence Mr. Preciado would have ever received.  In fact, it would be more than twice the longest sentence he has ever served, *see* PSR 41, rendered even more significant by the fact that it comes after eight years in the community, most of them spent lawfully and productively.

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.

Nor is a longer sentence needed to ensure Mr. Preciado's rehabilitation and afford deterrence, general or specific.  As to general deterrence, research has consistently showed that while the certainty of being caught and punished has a deterrent effect, "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  Research has also consistently shown that increased punishment does not afford specific deterrence.  "The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is . . . not consistent with the preponderance of available evidence." Mark W. Lipsey & Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews*, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007).  In fact, shorter sentences are more likely to accomplish the goals of sentencing:

> [W]hen prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010) (available at http://sentencingproject.org/doc/Deterrence%20Briefing%20.pdf).  While still lengthy, a sentence of 72 months would give Mr. Preciado the chance to remain involved in his sons' lives as they make their way through middle school and onto high school by guiding their education through supplemental homework, as he has been doing thus far, and through advice, communication, and the power of his own example, as he hopefully completes his degree.  In turn, maintaining that relationship will increase even more the likelihood that Mr. Preciado will successfully reenter the society upon his release.  *See id.*

Finally, Mr. Preciado's sentence will not end with his imprisonment.  Upon release, he will be on supervised release for 72 months.  Unsurprisingly, he welcomes the guidance, supervision, and support that he will undoubtedly receive from the Probation's Office.  As the PSR notes, he "expressed an appreciation for court ordered community supervision and voluntarily stated that regular drug testing will hold him accountable and assist him with long-term sobriety.  He intends

13

to take advantage of any occupational resources provided to him while on supervised release." PSR ¶ 61. There is no doubt that, given Mr. Preciado's proven ability to turn his life around, his family's love and support, and the Probation Office's dedication and resources, he will come out of his imprisonment stronger than he has ever been and that he will once again become a productive, law-abiding member of the community.

## CONCLUSION

For the aforementioned reasons, Mr. Preciado respectfully requests that the Court impose a sentence of 72 months of imprisonment and 72 months years of supervised release. He further respectfully requests that the Court recommend that he participate in the Residential Drug Treatment Program. Finally, he respectfully requests that the Court recommend that he be placed at FCI Florence in Colorado, USP Coleman in Florida, or FCI El Reno in Oklahoma.

Dated: May 4, 2016                                     Respectfully submitted,


                                                              /s/

                                                       _____
                                                       CARMEN SMARANDOIU
                                                       Assistant Federal Public Defender

*US v. Preciado,* No. CR 16-00010 CRB;
Def.'s Sent. Mem.